IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STEWART LOGAN; CAROL TAUBEE;
and CLYDE WARD,

            Plaintiffs,

vs.                                                            No. CIV 15-0785 JB/KK

PUBLIC EMPLOYEES RETIREMENT
ASSOCIATION; PUBLIC EMPLOYEES
RETIREMENT ASSOCIATION BOARD;
PATRICIA FRENCH; PAULA FISHER;
ROMAN JIMENEZ, JACKIE KOHLASCH;
DAN MAYFIELD, LORETTA NARANJO
LOPEZ, and JOHN REYNOLDS, in their
official capacities,

            Defendants,

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Preliminary Injunction and Memorandum in Support, filed November 4, 2015 (Doc. 22)("Motion"). The Court held a hearing on December 1, 2015. The primary issues are: (i) whether the proposed injunction would alter the relevant status quo; (ii) whether the Plaintiffs would suffer irreparable harm between now and a full trial on the merits if the Court were to not issue the requested preliminary injunction; (iii) whether the injury that the Plaintiffs would sustain in the absence of the requested preliminary injunction outweighs the injury that the issuance of the requested preliminary injunction would cause the Defendants; (iv) whether issuing the requested preliminary injunction would be adverse to the public interest; and (v) whether the Plaintiffs have a substantial likelihood of succeeding on the merits of their claim that the Defendants violated their constitutional rights by preventing Logan from becoming a candidate for the

"county position" on the Public Employees Retirement Association's ("PERA") Board of Directors ("PERA Board") and cancelling the election.

First, the Court concludes that the relevant status quo is the situation before April 8, 2015, when Plaintiff Stewart Logan was a viable candidate for the county seat and the parties' dispute had not yet begun, and that the proposed injunction will not alter the status quo. Second, the Court concludes that the harms that the requested injunction seeks to prevent would be irreparable. Third, the Court concludes that the harm to the Plaintiffs in the absence of the preliminary injunction outweighs the relatively minor expenses that the preliminary injunction would impose on the PERA. Fourth, the Court concludes that the requested preliminary injunction would not be adverse to the public interest. Finally, the Court concludes that the Plaintiffs do not have a substantial likelihood of succeeding on the merits of their claim. The substantial-likelihood-of-success standard is a necessarily speculative one, which does not require the Plaintiffs to carry their full burden of proof at the preliminary-injunction stage. Still, the Plaintiffs' claims are speculative, and they have not cited any cases directly on point. Because failure on any of the four prongs necessitates denial of a preliminary injunction, the Court will deny the Motion.

## **FINDINGS OF FACT**

Pursuant to rule 52(a)(2) of the Federal Rules of Civil Procedure, the Court will make formal findings of fact and conclusions of law to support its disposition of the Motion. See Fed. R. Civ. P. 52(a)(2), 65(d)(1).[1]  The Court divides its findings of fact into two sections: first, the

---

[1]The parties agree on almost all of the facts in this case. See Transcript of Motion Proceedings at 19:14-17 (Lowry)(taken December 1, 2015)("Tr.")("I really think that . . . factually there is some minor discrepancies on the fringes of this case, but I think in the main, the facts are pretty well known and agreed upon by the parties."); Tr. at 46:2-47:4 (identifying only one factual dispute). The Court's citations to the transcript for this hearing refer to the court

Court will first introduce the parties; and second, it will outline the timeline of events in this case.

**1.      The Parties.**

1.      The PERA "is a statutorily created association whose members are designated under N.M. Stat. Ann. 1978, § 10-11-3."   First Amended Complaint for Declaratory, Preliminary, and Permanent Injunctive Relief ¶ 9, at 3, filed in state court September 2, 2015, filed in federal court September 4, 2015 (Doc. 1-3)("Complaint").[2]

2.      The PERA is "a 401(a) qualified government plan governed by the New Mexico Public Employees Retirement Act."    About PERA, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/about (last visited Jan. 9, 2016).

3.      The PERA administers the primary pension plan for state and municipal employees in New Mexico, with the exception of teachers, who use the separate New Mexico Educational Retirement Board.    See About PERA, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/about (last visited Jan. 9, 2016).

4.      The PERA "manages 31 retirement plans and two benefit tiers for state, municipal and county employees. This includes police, firefighters, judges, magistrates, legislators and volunteer firefighters.  The association also manages retirement plans for other political subdivisions, such as special districts and housing authorities."    About PERA, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/about (last visited Jan. 9, 2016).

---

reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

[2]The Court cites to the Complaint only for facts that the parties do not dispute.

5.      Defendant PERA Board governs the PERA and appoints its Executive Director, who manages day-to-day operations.  See Board of Trustees, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees (last visited Jan. 9, 2016).

6.      The PERA Board has twelve members: four under a state coverage plan, whom state members elect; three under a municipal coverage plan, whom municipal members elect; one municipal member who is a county employee, whom municipal members elect; two retired members, whom PERA retirees elect; the New Mexico Secretary of State (ex officio); and the New Mexico State Treasurer (ex officio).   See Board of Trustees, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees (last visited Jan. 9, 2016).

7.      The PERA Board's mission is "to preserve, protect, and administer the trust to meet its current and future obligations and provide quality services to Association members." Board of Trustees, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees (last visited Jan. 9, 2016).

8.      Plaintiff Stewart Logan, who works in Farmington, New Mexico, currently holds the county board member position on the PERA's Board.  See Motion at 3.

9.      Logan seeks to retain this position.  See Complaint ¶ 6, at 2-3.

10.     Plaintiff Carol Taubee is a qualified voter for the county seat election for the PERA Board.  See Complaint ¶ 7, at 3.

11.     Taubee made a nomination[3] for Logan.  See Motion at 3.

_____

[3]The Plaintiffs use the terms "nominating petition," "nominating signature," "nomination," and "nominating request" in a confusing manner.   The New Mexico Administrative Code requires candidates to obtain "a minimum of 150 valid nominations" to be

12.     Plaintiff Clyde Ward is a qualified voter for the county seat election for the PERA Board.  See Complaint ¶ 8, at 3.

13.     Ward also made a nomination for Logan.  See  Motion at 3.

14.     Defendant Patricia French is the Chair of the PERA Board and one of its Municipal Members.  See Board Membership, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees/leadership (last visited Jan. 9, 2016).

15.     French has held both of these positions during the relevant events.   See Complaint ¶ 11, at 3.

16.     Defendant Paula Fisher is one of the PERA Board's State Members.   See Complaint ¶ 12, at 3.

17.     Fisher held this position during the relevant events.   See Complaint ¶ 12, at 3.

18.     Defendant Roman Jimenez was one of the PERA Board's State Members at the time of the relevant events.  See Complaint ¶ 13, at 4.

19.     Jimenez is no longer a PERA Board member.  See Board Membership, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees/leadership (last visited Jan. 9, 2016).

---

eligible for an election for the PERA Board.  N.M.A.C. § 2.80.200.70(A)(3).  A nomination must include: "a signature, a legible printing of the member's name, the member's current employer and one of the following: 1) the last four digits of the member's social security number; 2) the member's date of birth; or 3) the member's PERA identification number."   N.M.A.C. § 2.80.200.70(A)(3).  A "nominating petition" appears to be a collection of nominations.  See N.M.A.C. § 2.80.200.70(A)(3) ("To be eligible, a candidate must have a minimum of 150 valid nominations . . . on his or her nominating petition.").  The Court remains unsure of precisely what a "nominating request" is.  Motion at 3.

20.     Defendant Jackie Kohlasch is one of the PERA Board's State Members.  See Board Membership, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees/leadership (last visited Jan. 9, 2016).

21.     Kohlasch held this position during the relevant events.  See Complaint ¶ 14, at 4.

22.     Defendant Daniel Mayfield is one of the PERA Board's Retiree Members.  See Board Membership, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees/leadership (last visited Jan. 9, 2016).

23.     Mayfield held this position during the relevant events.  See Complaint ¶ 15, at 4.

24.     Defendant Loretta Naranjo Lopez is one of the PERA Board's Retiree Members. See Board Membership, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees/leadership (last visited Jan. 9, 2016).

25.     Naranjo Lopez held this position during the relevant events.  See Complaint ¶ 16, at 4.

26.     Defendant John Reynolds is one of the PERA Board's State Members.  See Board Membership, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees/leadership (last visited Jan. 9, 2016).

27.     Reynolds held this position during the relevant events.  See Complaint ¶ 17, at 4.

**2.      The Timeline of Events.**

28.     The PERA Board's members serve four-year terms.  See Board Elections, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees/elections (last visited Jan. 9, 2016).

29.     On January 13, 2015, the PERA Board held a meeting and adopted Resolution 15-04, which governed its next round of elections.  See Motion at 3; Response to Plaintiffs' Motion

for Preliminary Injunction and Memorandum in Support at 2, filed November 25, 2015 (Doc. 24)("Response").

30.      Resolution 15-04 states that nominations for the PERA Board's county seat election were required to be "completed and filed with PERA not later than 5:00 p.m. on April 14, 2015."  Motion at 3; Response at 2 (using identical language).

31.      Potential candidates had to obtain 150 nominations to qualify as candidates.  <u>See</u> Motion at 3; Response at 3.

32.      The Defendants now state that Resolution 15-04's Tuesday, April 14, 2015 date was a typographical error, and the date should have been Monday, April 13, 2015.  <u>See</u> Response at 2, 4-5.

33.      The PERA Board provided printed election materials to possible candidates that identified the deadline as April 13, 2015.  <u>See</u> Motion at 17; Response at 4-5.

34.      Logan submitted eighty-four valid nominations before April 13, 2015.  <u>See</u> Motion at 3; Response at 3.

35.      Logan's nominations included Plaintiffs Taulbee's and Ward's nominations.  <u>See</u> Motion at 3.

36.      On April 8, 2015, Logan mailed nineteen pages of nominating petitions with one-hundred and sixty-four nominations to the PERA using the United States Postal Service ("USPS").[4]  <u>See</u> Motion at 3.

---

[4]The parties' only factual dispute relates to the precise dates when Logan mailed his additional nominations to the PERA and when they arrived.  The Plaintiffs describe the factual dispute as "when did these 19 pages of nominating petitions enter[] the United States mail system and when did they depart the United States mail system."  Tr. at 19:21-20:1 (Lowry). The Plaintiffs state that Logan mailed his additional nominations to the PERA on April 8, 2015. <u>See</u> Motion at 3.  The Defendants contend that Logan cannot demonstrate this fact.  <u>See</u> Response at 21.  They note that: (i) the postmark on Logan's letter does not show the post office

37.     Logan mailed the petitions and nominations to the PERA by placing the original versions in an envelope and leaving it with his employer, San Juan County, in Aztec, New Mexico.  See Motion at 3.

38.     On April 13, 2015, Logan called the PERA to ask whether he could fax additional nominations on the day before the deadline.  See Motion at 18; Response at 2.

39.     The PERA informed him that all nominations/nominating petitions had to be originals.  See Motion at 18; Response at 2.

40.     On April 14, Logan called the PERA to determine whether it had received his mailed nominations.  See Complaint ¶ 42, at 9; Response at 2.

41.     The PERA informed him that it had not received his mailing.   See Complaint ¶ 42, at 9; Response at 2.

42.     At 2:54 p.m. on April 14, 2015, Logan emailed scanned copies of his additional nominations to the PERA.  See Motion at 3; Response at 2.

_____

or the time of day; and (ii) Logan used a private postage meter, so the Court cannot determine whether Logan delivered the letter to a U.S. Post Office.  See Response at 21.

     The Defendants also argue that Logan "has submitted two different letters that are not entirely consistent": (i) the Letter from Laura Stowe, Flora Vista Postmaster, USPS, dated April 16, 2015, filed November 25, 2015 (Doc. 24-8)("Letter"); and (ii) the Declaration of Sandi Whiten ¶¶ 7-8, at 2, filed November 30, 2015 (Doc. 25-2)("Declaration").  Tr. at 46:7-10 (Rennick).  The Letter states that the nominations "would have been sent directly to the Santa Fe Post Office to be delivered" and that "[t]his piece of mail should have been accepted by the 13th of April for this customer."  Letter at 1.  The Declaration states that, "[b]ased on the way the mail is handled in my employer's office," Logan's letter would have been placed in the U.S. mail on April 8, 2015 and picked up by the USPS around 3:30 p.m.  Declaration ¶¶ 7-8, at 2.  The Court does not understand why these letters are inconsistent.  Logan could have mailed the envelope from his office in Aztec, New Mexico on April 8, 2015.  The USPS could have picked it up from his office, passed it through the post office in nearby Flore Vista, New Mexico, sent it to Albuquerque, New Mexico for processing, and delivered it to Santa Fe, New Mexico as discussed in the postmaster's letter.

     Furthermore, the Court finds Logan's statements credible and concludes that he mailed his additional nominations on April 8, 2015.  As discussed in greater detail below, this conclusion has no effect on the Court's decision on the Motion.

43.     Logan's email stated that: "I know these are not acceptable as the original petitions, but I wanted to send them in so you will know who signed as a way of verifying the petitions (if they are ever found)."  Response at 2.  See Motion; Reply (not disputing this fact).

44.     On April 15, 2015, at approximately 8:39 a.m., PERA stamped Logan's original additional nominating petitions and nominations as received by United States mail.  See Motion at 4; Response at 2.

45.     On April 16, 2015, Logan sent a letter to the PERA's deputy general counsel, Karen Risku, explaining that a reasonable person would expect that his hard-copy nominations would be delivered within three days.  See Motion at 4; Response at 2.

46.     Logan's letter attached a separate letter from the Postmaster of the Flora Vista Post Office stating that the PERA should have received the nominations within three days.  See Motion at 4; Response at 2.

47.     On April 24, 2015, the PERA Board's Election Committee met to verify signatures, approve signature counts, and certify candidates for the county seat election.  See Motion at 4; Response at 2-3.

48.     The Election Committee determined that Logan had submitted 268 total nominations, disallowed 184 of these nominations, and allowed 84 nominations.  See Motion at 4; Response at 3.

49.     The Election Committee accepted 169 nominations for the other possible candidate, James Maxon, making Maxon the only remaining candidate for the county seat.  See Motion at 5; Response at 3.

50.     The Election Committee submitted its report to the full PERA Board.  See Motion at 5; Response at 3.

51.     On May 12, 2015, the full PERA Board met to consider the Election Committee's report.  See Motion at 5; Response at 3.

52.     Logan, a PERA Board member, argued that the PERA Board should reverse the Election Committee's decision disallowing his nominations.  See Motion at 5; Response at 3.

53.     The PERA Board declined to stay the decision or allow Logan's additional nominations, and accepted the Election Committee's report.  See Motion at 4; Response at 4.

54.     The PERA Board then voted to cancel the county-employee election pursuant to N.M.A.C. § 2.80.200.70(A)(6) and declare Maxon the winner on the grounds that only one candidate had met the nomination requirements.  See Response at 4.

## PROCEDURAL BACKGROUND

The Court will briefly outline this case's progress and summarize the parties' arguments for and against the Motion.  The Court will first describe what has happened in the case besides the Motion.  Second, the Court will describe the Plaintiffs' and the Defendants' positions vis-à-vis the Motion.

**1.      The Case's Pre-Motion Background: Pleadings and Removal.**

1.      The Plaintiffs initiated this case on August 5, 2015 in the First Judicial District Court, County of Santa Fe, state of New Mexico.  See Complaint and Application for Civil Restraining Order at 1, filed in state court August 5, 2015, filed in federal court September 4, 2015 (Doc. 1-2).

2.      The Plaintiffs filed an amended complaint on September 2, 2015.  See Complaint at 1.  The Complaint describes Logan as "a candidate for the county seat" on the PERA Board, and Taulbee and Ward as "qualified voters who desire to have Mr. Logan on the ballot for the county seat."  Complaint at 1.  The Complaint targets the PERA, the PERA Board, and each of

the other PERA Board members who held their positions during the relevant events.  <u>See</u>

Complaint ¶¶ 11-17, at 3-4.  It alleges that the Defendants "have violated Plaintiff's

constitutional rights of political association, ballot access, and ability to redress grievances under

the First and Fourteenth Amendments to the United States Constitution, as well as article II, § 8

and article VII, § 5 of the New Mexico Constitution."  Complaint at 1.  It seeks

> declaratory and injunctive relief under 42 U.S.C. § 1983, as well as New Mexico
> law, ordering PERA, PERA's Board, and its individual Board Members to qualify
> Mr. Logan as a candidate for the county seat on PERA's Board and ordering
> PERA to hold a fair and impartial election that includes Mr. Logan for the county
> seat.

Complaint at 2.

3.      The Defendants filed a Notice of Removal on September 4, 2015.  <u>See</u> Notice of

Removal, filed September 4, 2015 (Doc. 1).  They noted that the Plaintiffs invoked 42 U.S.C. §

1983, stating that their Complaint "is founded on a claim or right arising under the Constitution,

treaties or laws of the United States."  Notice of Removal at 2.

        **2.      <u>The Plaintiffs' Motion</u>.**

4.      The Plaintiffs filed the Motion on November 4, 2015.  They request that the

Court: (i) issue a preliminary injunction preventing the PERA from filling the PERA Board's

county seat position; (ii) issue a preliminary injunction requiring the PERA to accept Logan's

nominations, thereby allowing him to be a candidate, and mail appropriate ballots to the PERA's

municipal county members; (iii) hold an expedited preliminary injunction hearing pursuant to

rule 65(a)(2) of the Federal Rules of Civil Procedure; and (iv) waive the bond requirements

under rule 65(c) of the Federal Rules of Civil Procedure.  <u>See</u> Motion at 1-2.

5.      The Plaintiffs make four primary arguments to support the Motion.  First, they

contend that they do not seek to change the status quo.  <u>See</u> Motion at 7-8.  They explain that the

United States Court of Appeals for the Tenth Circuit defines the status quo as the "last peaceable uncontested status existing between the parties before the dispute developed."  Motion at 7 (quoting Schrier v. University of Colorado, 427 F.3d 1253, 1260 (10th Cir. 2005)).  They describe the relevant "status quo" as the situation before April 8, 2015, when Logan was a PERA Board member "who had made known his intention to run in the upcoming election" and "had gathered significantly more than the required 150 nominati[ons] he needed to be qualified for a place on the PERA ballot for the county seat position."  Motion at 7 (alterations added).  In Schrier v. University of Colorado, they note, the Tenth Circuit held that a physician seeking reinstatement to his position as chair of a department of medicine was not seeking to change the status quo.  See Motion at 7 (citing Schrier v. Univ. of Colo., 427 F.3d at 1260).  The Plaintiffs argue that, like the plaintiff in Schrier v. University of Colorado, they seek only "to return Mr. Logan to his previous status as a viable candidate for the county seat."  Motion at 7-8.

6.     Second, the Plaintiffs argue that they will suffer irreparable harm which that outweighs any possible prejudice to the Defendants.  See Motion at 8-12.  Although the Motion is not entirely clear, it seems to define the relevant injuries as the violation of the Plaintiffs' liberty and property interests; namely, "their constitutional right to associate for political purposes and vote for a candidate of their choice," as New Mexico statutes establish these rights. Motion at 9, 12 (citing N.M. Stat. Ann. 1978, §§ 10-11-130(B)(3)-(5)).  Both of these rights, they say, are fundamental rights.  See Motion at 12.  The Plaintiffs also cite two Supreme Court of New Mexico decisions that protect voters' rights.  See Motion at 9-10.  The first decision, Valdez v. Herrera, 1944-NMSC-013, 145 P.2d 864, overturned a district court's decision to strictly enforce a state statute that required all ballot boxes to be returned within twenty four hours of poll closure.  See Valdez v. Herrera, 1944-NMSC-013, ¶¶ 5-22, 145 P.2d at 869.  The

Supreme Court of New Mexico explained that "the voter should not lightly be deprived of his right, nor should the successful candidate suffer, if by any reasonable interpretation of the laws governing elections it can be prevented."  1944-NMSC-013, ¶ 29, 145 P.2d at 870.  The second decision, <u>Charley v. Johnson</u>, 2010-NMSC-024, 233 P.3d 775, held that "challenges to nominating petitions are not favored, and every precaution must be taken to protect the right of New Mexico citizens to vote for the candidate of their choice."  2010-NMSC-024, ¶¶ 11, 145 P.2d at 778.  The Plaintiffs state that these cases show that courts "generally interpret . . . procedural ambiguities in favor of inclusion and upholding the right to vote."  Motion at 14.

7.      The Plaintiffs then balance their potential injuries against the possible prejudice to the Defendants.  <u>See</u> Motion at 12.  They argue that the failure to grant a preliminary injunction will deprive the Plaintiffs of their constitutional rights, and that "[t]he deprivation of a constitutional right is a significant and irreparable injury."  Motion at 12 (quoting <u>Herrera v. Santa Fe Pub. Sch.</u>, 792 F. Supp. 2d 1174, 1198 (D.N.M. 2011)(Browning, J.)).  On the other hand, they contend that, "[i]f the preliminary injunction is granted, the parties will simply be required to maintain the status quo of not having the county seat position filled until the contested issues in this matter have been examined and ruled upon by the Court."  Motion at 12.  They conclude that the possible deprivation of their fundamental rights "far outweighs any administrative costs or inconvenience to PERA or its Board."  Motion at 12.

8.      Third, the Plaintiffs argue that their proposed preliminary injunction would not be adverse to the public interest.  <u>See</u> Motion at 12-14.  They note that the Tenth Circuit's cases suggest that it "is always in the public interest to prevent the violation of a party's constitutional rights."  Motion at 13 (quoting <u>Awad v. Ziriax</u>, 670 F.3d 1111, 1132 (10th Cir. 2012)(internal citation omitted)).  The right to vote, they explain, "protects all citizens' fundamental rights and

privileges."  Motion at 13.  The Plaintiffs add that the PERA Board's "autarchic" decision to cancel the election "disenfranchised an entire class of PERA members."  Motion at 14.

9.      Finally, the Plaintiffs contend that they have a substantial likelihood of success on the merits.  Their arguments have five basic components.  First, they contend that the PERA Board erred in cancelling the election.  See Motion at 15.  They cite N.M. Stat. Ann. 1978, §§ 10-11-130(B)(3), (4), and (5), which state that PERA Board members are "to be elected by the members" of the PERA.  Motion at 15.  They argue that this statute conflicts with a PERA rule allowing the PERA Board to cancel an election if only one member is nominated.  See Motion at 15 (citing N.M.A.C. § 2.80.200.70(A)(6)).   They conclude that the PERA Board's decision to cancel the election violated state and federal law.  See Motion at 15.

10.      Second, they say that the PERA Board erred by failing to consider Logan's reasonable expectation that his mailed nominations would arrive by "April 11 or 12, 2015." Motion at 16.  They argue that the "common law mailbox rule" should apply, creating a rebuttable presumption that a letter was received if it was "properly addressed and deposited in the United States mail, with postage duly prepaid thereon."  Motion at 16 (citing Crude Oil Corp. v. Comm'r of Internal Revenue, 161 F.2d 809, 810 (10th Cir. 1947)).  They add that a three or five-day presumption for mailing time should apply.  See Motion at 16 (citing Lozano v. Ashcroft, 258 F.3d 1160, 1165 (10th Cir. 2001)).  They thus conclude that "the PERA Board should have accepted Mr. Logan's petitions, as their actual delivery date was beyond his control."  Motion at 16.

11.      Third, the Plaintiffs assert that the PERA Board must use the April 14, 2015 date listed in Resolution 15-04.  See Motion at 17.  They state that the PERA Board cannot construe the date as a typographical error, because such construction "'will substantially and adversely

affect the rights of" another."  Motion at 17 (citing In re Garrison P., 2002-NMCA-094, ¶ 10 (discussing criminal charges)).  Fourth, the Plaintiffs say that Logan fully complied with Resolution 15-04 by emailing scanned copies of his nominations to the PERA.  See Motion at 18.  They note that there was no rule requiring original versions, despite rules imposing other requirements.  See Motion at 18 (citing N.M.A.C. § 2.80.200.70(A)(3)).

12.     Finally, the Plaintiffs argue that the PERA Board should have interpreted the ambiguous word "returned" in Resolution 15-04 "in favor of inclusion."  Motion at 18.  They also state that Logan's scanned document complied with Resolution 15-04.  See Motion at 18-19.

**3.      The Defendants' Response.**

13.     The Defendants responded on November 25, 2015.  See Response at 1.  They begin by attacking the entire basis for the Plaintiffs' lawsuit, noting that "the PERA Board election is not a public election covered by either the state or the federal constitutional provisions."  Response at 6.  They argue that the Constitution of New Mexico's provisions on state elections apply "only to elections by the general electorate to public office."  Response at 6 (citing Davy v. McNeill, 1925-NMSC-040, ¶ 34, 240 P. 482, 489 (1925)(holding that the Constitution did not cover an irrigation district election)).  They add that New Mexico's state election code applies to seven specific categories of cases, which do not include this sort of limited election.  See Response at 7.  They acknowledge that PERA is an "adjunct state agency," but argue that it does not hold any "public election in which the general electorate may participate."  Response at 7-8.  They also point out that the New Mexico Constitution's suffrage right does not encompass a candidate's right to run for office.  See Response at 8.

14.     The Defendants state that the Plaintiffs' claims also fail under federal law, because the election did not involve state action.  See Response at 8-12.  The Defendants rely on

Akina v. Hawaii, No. CV 15-00322 JMS/BMK, 2015 WL 6560634 (D. Haw. Oct. 29, 2015)(Seabright, J.), which held that a private company using state funds to administer an election for a Native American group did not satisfy the requirement for a state actor.  See Response at 9-10 (citing  2015 WL 6560634, at *16).  They point to similarities in their own case -- the PERA's election is "restricted to members within designated [PERA] employment categories" and "does not result in any federal, state or county officeholder."  Response at 11.  They also remark that "[v]irtually all of the voting rights cases cited by Plaintiffs involve public elections for state or federal office."  Response at 11.  The only exception, they argue, involved a private primary election open to whites only that "was the functional equivalent of the actual primary election" for the Democratic party.  Response at 11 (citing Terry v. Adams, 345 U.S. 461, 470 (1953)).

15.     The Defendants next argue that the Plaintiffs seek to alter the status quo.  They note that Logan will serve as an appointed board member until the PERA Board swears in new members on January 12, 2016.  See Response at 12.  If the Court grants a preliminary injunction, they say, "Mr. Logan will retain his position *after* his term expires" because his successor will not yet be qualified.  Response at 12.  They also argue that the Plaintiffs failed to preserve the status quo as of April 8, 2015 by waiting too long to file their Complaint.  See Response at 14-15.  They allege:

> A preliminary injunction that returns the matter to its status as of April 8 would have the effect of overturning the entire process that was never effectively challenged until September 2, 2015, and it would unduly extend Mr. Logan's service beyond the end of his term and intrude into the next term.

Response at 14-15.

16.     The Defendants close by attempting to rebut the Plaintiffs' arguments on the factors necessary for a preliminary injunction.  See Response at 15-20.  First, they explain that

the Plaintiffs will not suffer any irreparable injury.  See Response at 16-17.  They contend that the Plaintiffs' constitutional rights "are not implicated in this limited, closed election."  Response at 16.  They contend that none of the Plaintiffs' cited cases excuse Logan's delay in submitting his nominations.  See Response at 16-17.  Second, they contend that the threatened injury neither outweighs the damage to the PERA nor poses a threat to the public interest.  See Response at 18-19.  They explain that the harm to the PERA is harm to the trust fund, which pays the organization's administrative expenses.  See Response at 18.  They also assert that the public interest "is clearly served by minimizing costs that would adversely affect the fund."  Response at 18.  They state that the PERA trust fund should not be required to fund an election with only one candidate.  See Response at 18-19.

17.     The Defendants argue that the Plaintiffs have no likelihood of prevailing on the merits.  See Response at 19-26.  First, they argue that N.M. Stat. Ann. 1978 § 10-11-30's requirement that PERA Board members be "elected by the members" of the PERA does not prohibit them from cancelling an election under N.M.A.C. § 2.80.200.70(A)(6).  Response at 19.  They note that courts must interpret a statute "so as to give effect to its objective and purpose, to give effect to its entire purpose, and to avoid an absurd result."  Response at 19 (citing N.M. Stat. Ann. 1978 § 12-2A-18(A)).  They state that an election with only one candidate would be absurd and that the PERA Board has a fiduciary duty to preserve the trust fund's resources.  See Response at 20.  Second, they question the Plaintiffs' reliance on the mailbox rule.  See Response at 21-22.  They note that: (i) their date-stamped envelope overcomes any presumption of earlier delivery; (ii) Logan could have delivered his petition by any other method within the three months before the deadline; and (iii) Logan has not produced enough evidence to show a "reasonable expectation of earlier delivery."  Response at 21-22.

18.     Third, the Defendants reject the Plaintiffs' argument that the April 14, 2015, date on Resolution 15-04 controls the deadline.  See Response at 22-23.  They note that Logan did not rely on the April 14, 2015 date, given that both his campaign materials and his early arguments in this matter assumed that the deadline was April 13, 2015.  See Response at 22-23.  They also argue that the PERA Board delegated its responsibilities to the PERA's Executive Director, who set the April 13, 2015 deadline consistently with past practice and disseminated election materials based on his decision.  See Response at 22-23.  Fourth, the Defendants argue that they properly rejected the petitions which Logan emailed on April 14, 2015.  See Response at 23-25. They dispute the Plaintiffs' reading of N.M.A.C. § 2.80.200.70(A)(3), which states: "A valid nomination shall include a signature, a legible printing of the member's name, the member's current employer and the last four digits of the member's social security number. A nomination that does not include all these elements shall not be counted."   Response at 24 (quoting N.M.A.C. § 2.80.200.70(A)(3)).  They explain the Plaintiffs "would re-write the first sentence to say 'a nomination that includes the four elements *must be counted*[,]'" requiring the PERA to accept any nomination that met the listed elements.  Response at 24 (emphasis in original).  They state that the Executive Director has the authority to develop regulations and procedures for the election, including the original signature requirement.  See Response at 24.  The requirement, they add, serves as a "bright-line requirement" that eliminates discretion and favoritism, and helps to ensure "that the person is in fact eligible to sign a nominating petition."  Response at 25. Fifth, the Defendants reject the Plaintiffs' argument that "the word 'filed' in the election resolution is inconsistent with the word 'returned' in the applicable rule and that 'returned' should mean 'mailed.'"  Response at 26.  They note that the Court should give great weight to

the PERA Board's interpretation of the statutes and rules that it administers.[5]  <u>See</u> Response at 26.

        **4.**        <u>**The Plaintiffs' Reply**</u>**.**

     19.     The Plaintiffs replied on November 30, 2015.  <u>See</u> Plaintiffs' Reply in Support of their Motion for Preliminary Injunction, filed November 30, 2015 (Doc. 25)("Reply").   The Plaintiffs place great weight on their argument that the PERA and its Board are state actors.  <u>See</u> Reply at 2.  They note that: (i) the New Mexico Constitution created the PERA; (ii) the PERA's governing statutes fall within Chapter 10 of New Mexico's statutes, which is titled "Public Officers and Employees"; (iii) New Mexico's Secretary of State and State Treasurer sit on the PERA's Board; (iv) New Mexico's Legislature requires that the PERA's members elect its Board members; and (v) the PERA is subject to the Open Meetings Act, N.M. Stat. Ann. 1978 §§ 10-15-1 - 10-15-4, which expressly applies to "the affairs of government and the official acts of those officers and employees who represent them."  Reply at 2-4 (quoting N.M. Stat. Ann. 1978 § 10-15-1(A)).   Furthermore, they explain that the PERA Board has the authority to adopt rules published in New Mexico's Administrative Code, which become legally binding.  <u>See</u> Reply at 4.

     20.     The Plaintiffs repeat their arguments that the PERA Board cannot ignore the Legislature's command to hold elections.  <u>See</u> Reply at 5 (citing N.M. Stat. Ann. 1978 § 10-11-130(C)).  They contend that the statute's repeated use of the words "elected" and "election" evidence its intent to require formal elections.  Reply at 5-6.  The Plaintiffs then attempt to

_____

    [5]This argument seems inconsistent with the Defendants' contention that there is no state action involved.   The Defendants cannot soundly deny that they are state actors while simultaneously arguing that they are entitled to deference under <u>Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n</u>, 1995-NMSC-062, ¶ 11, 904 P.2d 28, 32.

establish that they have constitutionally protected rights to choose their representative member through an election.  See Reply at 6-9.  They distinguish Akina v. Hawaii on the ground that it involved a private actor intended to be independent of the State of Hawaii rather than "state actors created by the New Mexico Constitution, and directly governed and controlled by multiple statutory regimes."  Reply at 8 (citing Akina v. Hawaii, 2015 WL 6560634, at *16).  They also point out that the Supreme Court of the United States has effectively stayed Akina v. Hawaii.  See Reply at 7-8 (citing Akina v. Hawaii, No. 15A551, 2015 WL 7691943, at *1 (U.S. Nov. 27, 2015)(Kennedy, J.)).

21.     The Plaintiffs next attempt to reinforce their description of the status quo.  See Reply at 9-10.  They state that the "Defendants' attempt to argue that the status quo should be the current situation in which the parties find themselves, months after the contested issues which form the basis for this action, is precisely the version of 'status quo' that has been soundly rejected by the Tenth Circuit."  Reply at 9 (citing Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 633 F. Supp. 2d 1257, 1268 (D.N.M. 2008)(Browning, J.)).  The Plaintiffs explain that a swift preliminary injunction would allow the Defendants to correct their mistake before Logan's successor takes up the county seat.  See Reply at 10.

22.     Finally, the Plaintiffs argue that the Defendants' failures to follow the statutory election requirements should bar them from making similar accusations against the Plaintiffs.  See Reply at 10-11.  They contend that the Defendants failed to hold a required election and failed to promulgate rules explaining their election requirements.  See Reply at 10-11.  They note that "mailing and counting statutorily required ballots does not breach PERA's fiduciary duty to its members."  Reply at 11.  They conclude by stating that the PERA members who signed Maxon's petitions voted to place his name on the ballot rather than to vote for him and that they

did not even receive a ballot.  <u>See</u> Reply at 11.  As the Plaintiffs see it, these individuals would not "have been deprived of anything other than the same right that Plaintiffs seek to secure -- the right to vote in the legally mandated PERA election."  Reply at 11.

**5.     <u>The Hearing</u>.**

23.     The Court held a hearing on the Motion on December 1, 2015.  The hearing consisted only of oral argument -- not witness testimony or other evidentiary presentations.

24.     The Court opened the hearing with its thoughts on the motion.  It stated that:

> I had a couple of thoughts.  One is I think the defendants are probably going to have a hard time convincing me that the PERA is not a state entity and there is not state action . . . .  I guess the thing I'm struggling with as far as the plaintiffs are concerned, I'm just trying to figure out why the United States constitution cares about how the elections take place over at the PERA.

Tr. at 3:13-24 (Court).

25.     The Plaintiffs largely stood behind their briefing, but they clarified their theory in minor ways.  <u>See</u> Tr. at 4:20-33:11 (Court, Lowry).  They stated that New Mexico law provides a liberty interest in the electoral process that the Fourteenth Amendment protects.  <u>See</u> Tr. at 5:14-6:16 (Court, Lowry).  They argued that New Mexico law could create a liberty interest requiring protection regardless whether it concerns public elections or involves large numbers of beneficiaries.  <u>See</u> Tr. at 7:11-8:20 (Court, Lowry).

26.     The Court questioned why, on the Plaintiffs' theory, a federal court should become involved in every dispute over the state election code.  <u>See</u> Tr. at 9:18-10:1 (Court).  The Plaintiffs responded that the question whether to hold an election at all is a matter of federal interest.  <u>See</u> Tr. at 11:9-19 (Lowry).  The Plaintiffs repeated their arguments that the Court should read the statutory language broadly and impose a mailbox rule on the PERA's elections. <u>See</u> Tr. at 24:12-20 (Lowry).

27.     The Defendants also stood behind their briefing.  They argued that the Court should remand the case to state court, because there "is not a federal claim."  Tr. at 33:17-34:9 (Rennick).  The Defendants stated that the PERA election "does not bear the relationship to governing that both state and federal cases require to get to the constitutional issues."  Tr. at 37:1-9 (Rennick).  They argued that the Court should hold that federal constitutional protections "apply to a state defined election that involves public issues, public officials and right of the general public to vote."  Tr. at 39: 14-21 (Rennick).  The Defendants also conceded that the PERA "is a state agency," adding that "[t]here is no question about that."  Tr. at 38:8-18 (Rennick).

28.     The Plaintiffs emphasized in rebuttal that their claims focus on the First Amendment's rights to political expression and the Fourteenth Amendment's due-process clause, rather than the Equal Protection clause.  See Tr. at 47:14-50:17.  This explanation distinguished their arguments from the Defendants' cited cases, which allegedly concern whether the plaintiffs could be members of more limited organizations, like irrigation districts.  See Tr. at 47:14-50:17.  The Plaintiffs also requested that the Court declare the New Mexico Administrative Code provision allowing the PERA Board to cancel an election unconstitutional.  See Tr. at 53:14-56:4 (Court, Lowry).

## CONCLUSIONS OF LAW

The Court will outline the generally applicable law surrounding preliminary injunctions and state elections.  It will then analyze the Motion.

## I.     LAW REGARDING PRELIMINARY INJUNCTIONS

1.      "It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."

Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue a preliminary injunction pursuant to rule 65, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."[6]  Resolution Trust Corp. v. Cruce,

---

[6]The requirement that the movant show a mere "substantial likelihood" of prevailing on the merits is the only prong of the preliminary-injunction analysis that is easier to satisfy than its analogous prong in the permanent-injunction analysis; permanent injunctions, obviously, require full success on the merits.  43A C.J.S. Injunctions § 55 ("In general, the standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that, for a preliminary injunction, the plaintiff must show a likelihood of success on the merits rather than actual success.").  It is not entirely clear what a preliminary-injunction movant's burden of proof is vis-à-vis the case's merits, as "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success -- the most common being that plaintiff must demonstrate a reasonable probability of success."  11A Charles Alan Wright, Arthur R. Miller, et. al., FEDERAL PRACTICE & PROCEDURE § 2948.3 (3d. ed. 2015)(footnotes omitted).  The Tenth Circuit, however, has provided more guidance than most Courts of Appeals have, stating on three occasions -- albeit in old cases -- that the movant must make "a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought." Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972); Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969); Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781 (10th Cir. 1964).

At a trial on the merits, a plaintiff bears two burdens of proof.  The first burden is the burden of production, which is sometimes called the burden of going forward.  If the plaintiff fails to carry the burden of production during his or her case-in-chief, then the court will decide the case in the defendant's favor, and the case will not go to the jury.  The second burden is the burden of persuasion, which refers to convincing the factfinder -- typically a jury -- that he or she has satisfied the ultimate standard of proof -- usually the preponderance-of-the-evidence standard.  There is also a third, even higher quantum of evidence, sometimes called the "third burden of proof," which a plaintiff carries when he or she presents evidence of such great extent

972 F.2d 1195, 1198 (10th Cir. 1992).  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7,

19 (2008)("Winter")("A plaintiff seeking a preliminary injunction must establish that he is likely

to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest."  (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))).  The movant bears the burden

of demonstrating all four prongs' satisfaction.  See Automated Mktg. Sys., Inc. v. Martin, 467

F.2d 1181, 1183 (10th Cir. 1972).

---

and one-sidedness that he or she is entitled to a verdict as a matter of law.  Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1236 n.27 (D.N.M. 2014)(Browning, J.). The third burden and the beginning burden of production are also the relevant standards applicable to summary-judgment motions by the plaintiff and by the defendant, respectively.

Moreover, satisfying the initial burden of production is known as presenting a "prima facie case."  Black's Law Dictionary 1310 (9th ed. 2009)(defining "prima facie case" as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor").  The best way to interpret the Tenth Circuit's dictate that the movant must make "a prima facie case showing a reasonable probability that he will ultimately [prevail]" is by requiring that the movant put forth enough evidence to both: (i) satisfy the burden of production -- meaning that if the same evidence were presented at trial, it would be sufficient for a reasonable factfinder to find in the movant's favor; and (ii) make it reasonably likely -- beyond just being "not unreasonable" -- that the factfinder would in fact find for the movant, i.e., that the movant would satisfy the burden of persuasion.  See 11A Wright & Miller, supra § 2948.3 ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning."  (footnotes omitted)).  The movant need not show a greater-than-fifty-percent probability of satisfying the burden of persuasion, as to require such a showing would be to convert the substantial-likelihood-of-success standard into the ultimate trial standard, which the case law makes clear is not the intended result.  See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)("The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits.").

The Court will require preliminary-injunction movants to carry the burden of production at the preliminary-injunction stage in all cases, and it will never require the movant to carry the full burden of persuasion at that stage.  As for where in between those two quanta of proof the Court will set the standard, it will vary in different cases, depending upon the strength of the movant's showing on the other three prongs: the irreparability of the movant's harm, the balance of harms as between the movant and the nonmovant, and the public interest.  Cf. Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d at 843 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.").

2.      "[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .'" Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005)(quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).   In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the part of the enjoined party; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 977 (10th Cir. 2004)(internal quotation marks omitted)("O Centro")). Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009)(citing O Centro, 389 F.3d at 975).   With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098-99 (10th Cir. 1991))(internal quotation marks omitted).

3.      "[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction . . . ." United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)).   See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(finding that a preliminary injunction should not issue where a remedy of money damages is available).   Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final

equitable remedy.  See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23

(1945); Reebok Int'l, Ltd. v. Marnatech Enter., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## II.      LAW REGARDING ELECTORAL FRANCHISE

1.      The United States Court of Appeals for the Fourth Circuit has stated that:

> Our constitution does not contemplate that the federal judiciary routinely
> will pass judgment on particular elections for federal, state or local office. The
> conduct of elections is instead a matter committed primarily to the control of
> states, and legislative bodies are traditionally the final judges of their own
> membership.  The legitimacy of democratic politics would be compromised if the
> results of elections were regularly to be rehashed in federal court.

Hutchinson v. Miller, 797 F.2d 1279 (4th Cir. 1986).  There is no express provision in the federal

constitution which sets forth the procedures a state must use in filling state office vacancies.  See

Rodriguez v. Popular Democratic Party, 457 U.S. 1, 8 (1982).  "When a State exercises power

wholly within the domain of state interest, it is insulated from federal judicial review."

Gomillion v. Lightfoot, 364 U.S. 339, 347 (1960).  States lose their insulation, however, when

their actions circumvent a federally protected right.  See Gomillion v. Lightfoot, 364 U.S. at 347.

## ANALYSIS

1.      The Court will deny the Motion.  The requested injunction does not fall into any

of the Tenth Circuit's three categories of disfavored preliminary injunctions.  Nevertheless, the

Plaintiffs have failed to establish three of the four showings required to merit the extraordinary

remedy of a preliminary injunction.  The Plaintiffs have shown a likelihood of irreparable harm

that the balance of harms weighs in their favor, and that the requested injunction is not adverse to

the public interest, but have not shown a likelihood of success on the ultimate merits.

I.   **THE REQUESTED INJUNCTION DOES NOT FALL INTO ANY OF THE THREE CATEGORIES OF DISFAVORED PRELIMINARY INJUNCTIONS.**

2.      The Tenth Circuit has identified three categories of disfavored preliminary injunctions -- mandatory injunctions, injunctions that alter the status quo, and injunctions that give the movant all the relief to which he or she would be entitled if he or she won at trial -- and the requested injunction does not fall into any of them.  See O Centro, 389 F.3d at 975.   A district court can determine whether a requested injunction is disfavored by looking at the relief it seeks.   See O Centro, 389 F.3d at 1003.   The strength of the movant's case or of the nonmovant's defenses, the peril that the movant faces if the request is denied, and the burden that the requested injunction would impose on the enjoined party -- considerations of central importance in deciding whether to grant a preliminary injunction -- have no effect on this analysis.   See Schrier v. Univ. of Colo., 427 F.3d at 1259.   The analytical effect of branding a requested preliminary injunction as "disfavored" is that it "warrants a heightened standard of proof," Schrier v. Univ. of Colo., 427 F.3d at 1259, and that it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course," O Centro, 389 F.3d at 975.   A request for a disfavored injunction must thus make a stronger holistic showing in the four-prong analysis.[7]

3.      The first disfavored category is "mandatory preliminary injunctions."   Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389 F.3d at 977)(internal quotation marks

---

[7]A request for a disfavored preliminary injunction is also not entitled to the Tenth Circuit's relaxed or "modified" substantial-likelihood-of-success standard, which reduces the plaintiff's required showing of that prong to raising "questions going to the merits [that] are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."   Davis v. Mineta, 302 F.3d at 1111 (10th Cir. 2002).   See O Centro, 389 F.3d at 975-76 ("[B]ecause a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard.").

omitted).  The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"  <u>Schrier v. Univ. of Colorado</u>, 427 F.3d at 1261 (all alterations but first in <u>Schrier v. Univ. of Colo.</u>)(quoting <u>O Centro</u>, 389 F.3d at 979).  The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, <u>i.e.</u>, that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.  <u>See Schrier v. Univ. Of Co.</u>, 427 F.3d at 1261.  It does so because a creative enough lawyer can present any injunction in either prohibitory or mandatory terms, depending on whether the lawyer is requesting or opposing it.  <u>Cf. Nat'l Fed'n of Indep. Business v. Sebelius</u>, 132 S. Ct. 2566, 2589 (2012)("To an economist, perhaps, there is no difference between activity and inactivity . . . ."); <u>O Centro</u>, 389 F.3d at 1006 (Seymour, J., dissenting)("There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing.").  An injunction directing a party to do something is not the biggest deal in the world -- and not fundamentally different from an injunction prohibiting something -- if everyone can agree on and understand exactly what the court is ordering and exactly what conduct would violate the injunction.  On the other hand, necessarily vague injunctions enjoining parties to "depopulate the jail system to constitutionally compliant levels," or to "perform on its promise to continue manufacturing and delivering conforming goods to the buyer," are a recipe for bogging the court down into the role of monitor.  <u>Dine Citizens Against Ruining Our Env't v. Jewell</u>, No. CIV 15-0209 JB/SCY, 2015 WL 4997207, at *33 (D.N.M. Aug. 14, 2015)(Browning, J.).

4.     Here, the requested injunction is not mandatory.  It seeks to prevent the PERA from filling the PERA Board's county seat position, require the PERA to accept Logan's nominations, and mail appropriate ballots to the PERA's municipal county members.  See Motion ¶¶1-2, at 1-2.  Ascertaining the Defendants' compliance with the injunction would require no special effort on the Court's part -- the injunction's terms are clear, its requirements would be short-term, and the Plaintiffs could simply alert the Court of any infractions.  Although the requirement that the PERA accept nominations and mail ballots out speaks in mandatory terms, it will not require ongoing supervision.

5.     The second disfavored category is "preliminary injunctions that alter the status quo."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389 F.3d at 977)(internal quotation marks omitted).  The status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."  Stemple v. Bd. of Educ. of Prince George's Cnty., 623 F.2d 893 (4th Cir. 1980).  When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro, 389 F.3d at 975.  If a court instead looks at the parties' legal rights, then a preliminary injunction will always change the status quo.

6.     Here, the Plaintiffs define the status quo as the situation before April 8, 2015, when Logan was a "viable candidate for the county seat."  Motion at 7-8.  The Defendants argue that it was the situation as of September 2, 2015, after the PERA mailed the ballots -- and that Mr. Logan will continue to serve in his position until January 12, 2016.  See Response at 14.

The Court agrees with the Plaintiffs, because the "last uncontested status" between the parties existed before Logan and the PERA Board began their dispute over his nomination. <u>Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.</u>, 269 F.3d 1149, 1155 (10th Cir. 2001)(citation omitted). The Defendants' proposed status quo is too similar to the "last status immediately before the filing for injunctive relief," which the Tenth Circuit has expressly rejected. <u>Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.</u>, 269 F.3d at 1155. An injunction would not alter the status quo here. It would preserve Logan's status as a viable candidate for the county seat, and he will hold the same Board position as he did on April 8, 2015. The Court acknowledges that the PERA will be unable to appoint a new member while the preliminary injunction remains in place. <u>See</u> Response at 12 (citing N.M. Stat. Ann. 1978, § 10-11-130(D)). It must, however, "restore the status quo ante when the continuation of the changed situation would inflict irreparable harm on plaintiff" and "protect the court's power to render a meaningful decision for either party." 11A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice & Procedure § 2948 (3d. ed. 2015).

7.     The third and final disfavored category is "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." <u>Schrier v. Univ. of Colo.</u>, 427 F.3d at 1258 (quoting <u>O Centro</u>, 389 F.3d at 977)(internal quotation marks omitted). The meaning of this category is self-evident, and the requested injunction does not fall into it. A win on the merits, absent a preliminary injunction, would require the Court to remove a sitting Board member from office and force the PERA to hold new elections -- intrusive steps that the Court may be unwilling to take. Even then, Logan would only serve out his remaining term, presumably far shorter, on the PERA Board. The Plaintiffs would likely not consider such an outcome to be a win on the merits, in any meaningful sense.

8.     The requested injunction is thus not disfavored at law, and, accordingly, the Court will not apply a heightened standard to it on that ground.  The Plaintiffs must still satisfy all four prongs of the standard preliminary-injunction analysis, however, and, as explained in the next portions of this Memorandum Opinion and Order, they have failed to show that they have a substantial likelihood of success on the merits.

## II.    THE HARMS THAT THE REQUESTED PRELIMINARY INJUNCTION SEEKS TO AVOID WOULD BE IRREPARABLE.

9.     The Plaintiffs' identified injury -- the violation of their constitutional rights -- is irreparable.[8]   The irreparable-harm prong's overarching inquiry "compares (i) what would happen if the preliminary injunction were not granted; with (ii) what would happen if the preliminary injunction were granted; and then (iii) asks whether the difference between (i) and

---

[8]The Plaintiffs correctly note that they must demonstrate a showing of "probable" irreparable harm.  Motion at 8 (quoting Planned Parenthood of Arkansas & E. Oklahoma v. Cline, 910 F. Supp. 2d 1300, 1308 (W.D. Okla. 2012)(Friot, J.)).  The Supreme Court overruled older lines of cases requiring a possibility of harm in 2008:

> The District Court and the Ninth Circuit also held that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a "possibility" of irreparable harm. . . .
>
> . . . .
>
> We agree with the Navy that the Ninth Circuit's "possibility" standard is too lenient.  Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.  11A Wright & Miller, supra, § 2948.1 (applicant must demonstrate that in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered").  Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20-21 (2008)(emphasis in original)(citations omitted).

(ii) is irreparable."  <u>Dine Citizens Against Ruining Our Env't v. Jewell</u>, 2015 WL 4997207, at

*48.  In this case, that analysis boils down to: (i) Maxon will take up the PERA Board's county

seat position on January 12, 2016; (ii) Logan will remain in the PERA Board's county seat

position until the PERA conducts an election; and (iii) the harm to the Plaintiffs will be

irreparable.

10.     The Defendants argue that, absent a preliminary injunction, "Plaintiff Logan will

retain his current Board position until January 12, 2016," and "Taulbee and Ward will thereby be

represented on the PERA Board by the member of their choice, and all county voters will be

represented on the PERA Board."  Response at 16.  This point ignores that the gap between (i)

and (ii) will change dramatically on January 12, 2016.  Taulbee and Ward will no longer be

represented by the member of their choice -- they will effectively be denied a choice.  Moreover,

even if Logan prevails on the merits and the election returns him to the PERA Board, he will

have missed a number of months when he should have been in office, including possible votes

on the trust fund's disposition.  Money damages will not suffice to remedy his injury; indeed, his

Complaint does not request any.

11.     The Plaintiffs also cite to cases analyzing whether the deprivation of a

constitutional right constitutes irreparable harm.  <u>See</u> <u>Herrera v. Santa Fe Pub. Sch.</u>, 792 F. Supp.

2d at 1198 ("The deprivation of a constitutional right is a significant and irreparable injury to the

individual holding the right.").   In <u>Elrod v. Burns</u>, for example, Justice Brennan's opinion

explained that "[t]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury."  <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976).

12.     These cases, however, are not conclusive.  Subsequent Tenth Circuit decisions

have linked the "irreparable injury" inquiry to the "likelihood of success" inquiry, holding that a

plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm.  See Schrier v. Univ. Of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005)("Dr. Schrier has failed to demonstrate the requisite likelihood of success on his free speech and academic freedom claims. As a result, he is not entitled to a presumption of irreparable injury.").  In Heideman v. S. Salt Lake City, 348 F.3d 1182 (10th Cir. 2003), for example, the Tenth Circuit held that a mere assertion that the harm implicates First Amendment claims is insufficient, as "[i]t is necessary, however, to consider the specific character of the First Amendment claim."   348 F.3d at 1190.   The Plaintiffs have failed to show a substantial likelihood of success on their constitutional claims, so the Court cannot allow them a presumption of irreparable injury.  Nonetheless, the Court concludes that the concrete and certain harm to the Plaintiffs that would result from the denial of a preliminary injunction means that they have satisfied the irreparable-harm prong.

## III.   THE BALANCE OF HARMS WEIGHS IN THE PLAINTIFFS' FAVOR, BECAUSE THEY WOULD SUFFER MORE HARM FROM THE INJUNCTION'S DENIAL THAN THE DEFENDANTS WOULD FROM ITS IMPOSITION.

13.   The Court concludes that the harm that will accrue before this case is resolved on the merits -- both to Logan and to the other two plaintiffs -- outweighs the minimal damage that a preliminary injunction would inflict on the Defendants.

14.   The Plaintiffs contend that the "irreparable harm at issue here involves the deprivation of fundamental rights, which far outweighs any administrative costs or inconvenience to PERA or its Board that a preliminary injunction may cause."  Motion at 12.  As discussed above, the Court does not accept the Plaintiffs' assertion that a fundamental right is at stake at face value.   The Court considers, however, the harm that would result from the injunction's denial, including Logan's loss of an opportunity to compete in the PERA election

and loss of a chance to participate as a member of its Board as well as the Plaintiffs' loss of an opportunity to vote for their preferred candidate.

15.     The Defendants have provided little evidence on the magnitude of the injunction's harms.  They dispute the Plaintiffs' characterization of the possible harm as "administrative costs or inconvenience," explaining that the real harm "to PERA is in the harm to the trust fund."  Response at 18-19.  Because the PERA's administrative expenses come out of its trust fund, the Defendants say, the requirement to conduct an unnecessary election would directly harm the PERA's members.  See Response at 18 (citing N.M. Stat. Ann. 1978, § 10-11-128).  The Defendants do not provide any estimate on the cost of conducting an election.  Nor do they suggest that the uncertainty of knowing precisely which person will fill the county seat will significantly harm their operations.  Moreover, the Plaintiffs suggest that the PERA has already re-mailed ballots for the state employee position "due to an error on PERA's part."  Reply at 11.

16.     In the absence of more concrete evidence, the Court concludes that a new election will not impose significant costs on the PERA.  The PERA has only one county seat.  See Response at 1.  Its rules "specify that only members of designated groups are to vote for representatives of that group."  Response at 7.  The resulting election would only involve one of the PERA Board's positions and only a limited subset of its total membership, which is in turn far smaller than the membership involved in a general election.

## IV.    THE REQUESTED INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.

17.     The same factors that make the Plaintiffs unlikely to prevail on the merits indicate that the proposed injunction does not strongly point in either direction.

18.     The Plaintiffs have not shown that a preliminary injunction would clearly benefit the public interest.  As noted above, the Court will not simply accept that a preliminary

injunction would allow the PERA's members "to participate in a free and fair election, which is in the public interest." Motion at 14. The Plaintiffs cite Awad v. Ziriax, 670 F.3d 1111 (10th Cir. 2012), for the proposition that "it is always in the public interest to prevent the violation of a party's constitutional rights." 670 F.3d at 1132. That case, however, involved a Muslim Oklahoman's effort to enjoin a proposed constitutional amendment prohibiting state courts from considering Sharia law. See 670 F.3d at 1118. The Tenth Circuit balanced Oklahomans' fundamental right to vote against the plaintiff's constitutional rights and concluded that enjoining the amendment was not adverse to the public interest. See 670 F.3d at 1132. Nor does the injunction at issue concern a law that sets out the public interest. See Tri-Cty. Wholesale Distributors, Inc. v. Wine Grp., Inc., 565 F. App'x 477, 483-84 (6th Cir. 2012)("The Franchise Act therefore represents the legislature's judgment that enforcement of the statute is in the public interest."); Golden Gate Rest. Ass'n v. City & Cty. of San Francisco, 512 F.3d 1112, 1126-27 (9th Cir. 2008)("[O]ur consideration of the public interest is constrained in this case, for the responsible public officials in San Francisco have already considered that interest.").

19.     The PERA represents a limited slice of the public at large, and its elections are not open to the public at large. See Response at 18. Its administrative expenses do not draw on taxpayer funds. See Response at 18 (citing N.M. Stat. Ann. 1978, § 10-11-128). Any uncertainty is unlikely to have a significant effect on the PERA's functions. The PERA Board normally has twelve members, at least ten of whom are actively involved in governance. See Board of Trustees, Public Employees Retirement Association of New Mexico, http://www.nmpera.org/board-of-trustees (last visited Jan. 9, 2016). The presence or absence of a single Board member is thus unlikely to affect its operations in any significant way. The PERA's Executive Director  manages its day-to-day operations. See Board of Trustees, Public

EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees (last visited Jan. 9, 2016).  The PERA also uses professional money managers to invest its assets and improve the trust fund.  See Arleen Jacobius, New Mexico PERA Invests $365 Million with 2 Hedge Fund Managers, PENSIONS AND INVESTMENTS (July 31, 2015), http://www.pionline.com/article/20150731/ONLINE/150739969/new-mexico-pera-invests-365-million-with-2-hedge-fund-managers (last visited Jan. 9, 2016).

20.     The Plaintiffs have not demonstrated that the preliminary injunction would benefit the public interest, but the standard requires them only to demonstrate that it would not harm the public interest.  There is no evidence indicating that the proposed preliminary injunction would have a significant adverse effect on the public interest.

## V.     THE PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

21.     The Plaintiffs have not established that they have a substantial-likelihood-of-success, because the evidence presented thus far does not persuade the Court that the Plaintiffs are reasonably likely to establish that the Defendants violated their rights under the First or Fourteenth Amendments.  The Court will first describe the legal standard behind the substantial-likelihood-of-success prong -- an exacting one, which dooms the Plaintiffs' Motion at least as much as the facts of this case -- and then apply that standard.

22.     The proper standard applicable to the substantial-likelihood-of-success prong is that the movant must (i) carry the burden of production, i.e., he or she must present a prima facie case; and (ii) make it reasonably likely -- beyond just being "not unreasonable" -- that the factfinder would actually find for the movant, i.e., that the movant would satisfy the burden of persuasion.  See supra note 6.  The Court will always require the full first showing -- the plaintiff must present a quantum of evidence sufficient to survive a motion for directed verdict if it were

presented at trial.  The Court should vary its demands for exactly what and how much persuasive evidence to require beyond the prima facie showing based on how strong a showing the plaintiff has made on the other three prongs.  This construction of the substantial-likelihood-of-success prong is in keeping with the majority approach, as Wright & Miller describes it:

> All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning.
>
> An appraisal of the possible outcome of the case on the merits is of particular importance when the court determines in the course of balancing the relative hardships that one party or the other will be injured whichever course is taken on the Rule 65(a) application.  However, the degree of likelihood of success is not determinative.  Rather it must be considered and balanced with the comparative injuries of the parties.  If plaintiff seems unlikely to win, a preliminary injunction will not be issued unless plaintiff demonstrates a strong probability of injury if the court fails to act.  Thus, the balancing which takes place between the two factors is often referred to as a "sliding scale." . . . .
>
> Accordingly, although a showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be by its grant does not remove the need to show some probability of winning on the merits, it does lower the standard that must be met.  Conversely, if there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that plaintiff is likely to prevail on the merits is particularly important.  In this same vein, it has been held that a preliminary injunction may be granted even though the harm factor favors defendant if plaintiff demonstrates a substantial likelihood of ultimately prevailing.

11A Wright & Miller, supra, § 2948.3 (footnotes omitted).  The Court's formulation uses the same principles to arrive at roughly the same result, and that result -- requiring the movant to fully carry the burden of production, and additionally present a likelihood, which will vary depending on the movant's showing on the other prongs, of carrying the burden of persuasion -- constitutes the analytical framework for assessing a movant's satisfaction of the substantial-likelihood-of-success prong in the ordinary case.

23.     Having outlined the substantial-likelihood-of-success standard, the Court will now apply it.  The Court concludes that the Plaintiffs do not have a substantial likelihood of success for two primary reasons.

24.     First, federal courts do not interfere in state elections under the circumstances present here.[9]  In general, federal courts must use great caution when interfering with state elections.  See Bush v. Gore, 531 U.S. 98, 123 (2000)(Stevens, J., dissenting)("On rare occasions . . . either federal statutes or the Federal Constitution may require federal judicial intervention in state elections.").   There is no federal constitutional requirement that the PERA's Board members be elected; New Mexico could have provided for them all to be appointed without any constitutional problems.  Although the state has decided to hold an election, federal courts will interfere only in a limited number of exceptional situations.[10]

---

[9]The Defendants ask the Court not to apply the full constitutional limitations -- whatever they are -- to the PERA, because its elections are too far down the food chain from public or general elections for higher office, such as for a governor or legislator.  See Response at 6-8.  The Court has declined to make a vertical decision, and decide that some offices need constitutional protection and that others do not based on their prominence.  If the PERA or an irrigation district discriminated on the basis of race or religion, the federal government would have a strong interest in intervening in its election.  Rather, the Court believes that the same body of federal constitutional law applies to all elections, big or small.  The Court believes, however, that some body of law -- to be applied to all elections -- should be narrow and carefully, sensitively applied.

[10]The Defendants rely on a distinction between "elections by the general electorate to public office" and elections of more limited interest, such as the PERA election, to show that they did not violate any state laws.  Response at 6, 11-12.  The Plaintiffs respond that the Defendants' "focus on the Election Code is misguided," instead pointing to the PERA's governing statutes.  Reply at 2.  The Court thus will not discuss whether the PERA's elections fall within New Mexico's Election Code in detail.  It notes, however, that at least one New Mexico case has held that Article VII § 2 of the New Mexico Constitution does not restrict the Legislature from prescribing the qualifications for junior college and irrigation district board members.  See Daniels v. Watson, 1966-NMSC-011, ¶ 7, 410 P.2d 193, 195-96.

25.     In <u>Warf v. Bd. of Elections of Green Cty., Ky.</u>, 619 F.3d 553 (6th Cir. 2010), for example, the plaintiffs challenged a Kentucky state court's decision that "altered the outcome of the election [for county clerk] and resulted in significant disenfranchisement."  619 F.3d at 559. The United States Court of Appeals for the Sixth Circuit first recognized the importance of the right to vote:

> "The right to vote is a fundamental right, 'preservative of all rights.'" *League of Women Voters v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008)(quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 . . . (1886)). Because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 . . . (1964).

619 F.3d at 559.  It continued, however, to note the limits on its own intervention:

> The Constitution, however, "'leaves the conduct of state elections to the states.'" *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005)(quoting *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980)). The "[p]rinciples of federalism," therefore, "limit the power of federal courts to intervene in state elections." *Id.* at 94 (quoting *Burton v. Georgia*, 953 F.2d 1266, 1268 (11th Cir. 1992))(internal quotation marks omitted). Courts "have long recognized that not every state election dispute implicates federal constitutional rights." *Burton*, 953 F.2d at 1268. As such, "'[o]nly in extraordinary circumstances will a challenge to a state [or local] election rise to the level of a constitutional deprivation.'" *Shannon*, 394 F.3d at 94 (quoting *Curry v. Baker*, 802 F.2d 1302, 1314, (11th Cir. 1986))(alteration in original).

619 F.3d at 559.  It then explained that a state's voting system implicated the Due Process clause, making § 1983 relief appropriate only "in the exceptional case where a state's voting system is fundamentally unfair."[11]  619 F.3d at 559.  It gave some examples of possible violations:

> Such an exceptional case may arise, for example, if a state employs "non-uniform rules, standards and procedures," that result in significant disenfranchisement and

---

[11]The fundamental unfairness standard came from <u>Griffin v. Burns</u>, 570 F.2d 1065 (1st Cir. 1978), which held that "due process is implicated where the entire election process including as part thereof the state's administrative and judicial corrective process fails on its face to afford fundamental fairness."  570 F.2d at 1078.  <u>But see</u> <u>Hoblock v. Albany Cty. Bd. of Elections</u>, 422 F.3d 77, 98 (2d Cir. 2005)(recognizing disagreement in cases of intentional state conduct).

vote dilution, *Brunner*, 548 F.3d at 478, or significantly departs from previous state election practice, *see Roe v. Alabama*, 43 F.3d 574, 580–81 (11th Cir. 1995) (intervening where failure to exclude contested absentee ballots constituted a post-election departure from previous state practice); *Griffin*, 570 F.2d at 1079 (intervening where state court disrupted seven-year practice of voting by absentee and shut-in ballot). Federal courts, however, "have uniformly declined to endorse action[s] under [§] 1983 with respect to garden variety election irregularities." *Griffin*, 570 F.2d at 1076; *see also Brunner*, 548 F.3d at 478 ("[T]he federal courts should not be asked to count and validate ballots and enter into the details of the administration of the election." (citation and internal quotation marks omitted)).

619 F.3d at 559.

26. The Plaintiffs' allegations are dissimilar from any of these "extraordinary" cases in which "a state's voting system is fundamentally unfair." Warf v. Bd. of Elections of Green Cty., Ky., 619 F.3d at 559. The PERA did not use "non-uniform rules, standards, and procedures," because it applied the same rules to all of the possible candidates. League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 478 (6th Cir. 2008). It has not significantly departed from its past election practices. See Griffin v. Burns, 570 F.2d at 1079. This case, involving arguments relevant to highly technical details, is a "garden variety election irregularit[y]," Griffin v. Burns, 570 F.2d at 1076, that asks the Court to "enter into the details of the administration of the election," League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 478 (6th Cir. 2008). See Curry v. Baker, 802 F.2d 1302, 1314 (11th Cir. 1986)("Only in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation.").

27. Similarly, in Bonas v. Town of N. Smithfield, 265 F.3d 69 (1st Cir. 2001), the United States Court of Appeals for the First Circuit considered a plaintiff's suit against a municipality which decided to hold elections only in even-numbered years, thereby extending its current leaders' terms by one year. See 265 F.3d at 71-72. The First Circuit noted the

importance of the right to vote, citing <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 370 (1886).  <u>See</u> 265 F.3d at 74.  It added, however, that "[d]espite this bedrock federal interest, a federal court may not inject itself into the midst of every local electoral dispute.  Election law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the state courts."  265 F.3d at 74.  The First Circuit noted that "with only a few narrow and well-defined exceptions, federal courts are not authorized to meddle in local elections.  Consequently, they normally may not superintend the step-by-step conduct of local electoral contests or undertake the resolution of garden variety election irregularities."  265 F.3d at 74 (quotations omitted).

28.     The First Circuit described only two such exceptions, (i) "when a discrete group of voters suffers a denial of equal protection"; and (ii) when a denial of substantive due process occurs, if "the election process itself reaches the point of patent and fundamental unfairness." 265 F.3d at 74.  The first exception applies when, for example, a primary election is open only to white voters.  <u>See</u> <u>Terry v. Adams</u>, 345 U.S. at 470.  The second exception applies in cases involving "total and complete disenfranchisement of the electorate as a whole."  265 F.3d at 75 (adding that the court could "imagine no claim more deserving of constitutional protection than the allegation that . . . officials have purposely abrogated the right to vote").

29.     The Plaintiffs' claims fall outside these two exceptions.  The Plaintiffs have not raised any equal protection arguments.  The case, moreover, does not involve "total and complete disenfranchisement of the electorate as a whole."  <u>Bonas v. Town of N. Smithfield</u>, 265 F.3d at 75.  The Plaintiffs contend that the PERA "canceled the election for the county seat," depriving all of PERA's county members of their First and Fourteenth Amendment rights.  Reply at 7.  The cases finding fundamental unfairness, however, involved very different facts.  The

defendants in <u>Bonas v. Town of N. Smithfield</u> disenfranchised the entire population of their municipality with flimsy justifications.  <u>See</u> 265 F.3d at 73.  The defendants in <u>Duncan v. Poythress</u>, 657 F.2d 691 (5th Cir. 1981), appointed an attorney to a state Supreme Court judgeship in spite of a statute requiring a special election.  <u>See</u> 657 F.2d at 693.  Neither of these cases is analogous to the PERA's decision not to count Logan's additional nominations or its failure to hold an election with a write-in space when there was only one candidate.  <u>See Marks v. Stinson</u>, 19 F.3d 873, 877-78 (3d Cir. 1994)(finding a violation because of extensive voter fraud and election officials' complicity in that fraud).

30.      The Court finds that the reasoning in <u>Warf v. Bd. of Elections of Green Cty., Ky.</u> and <u>Bonas v. Town of N. Smithfield</u> is compelling.  This dispute involves issues -- including whether the mailbox rule should apply, whether a PERA Board Resolution's date can be considered a typographical error, and whether nominations for the PERA's elections must be original -- that do not justify federal courts' intrusion into state elections.  Given the absence of authority to the contrary from the Tenth Circuit, the Court concludes that the Plaintiffs are unlikely to succeed for this reason alone.  Even if these cases did not exist, however, the Plaintiffs' specific allegations would still suffer from significant flaws.[12]

31.      Second, the Court is reluctant to grant a federal injunction in a case where it would normally decline to exercise supplemental jurisdiction.  Section 1367(c) of Title 28 of the United States Code allows district courts to "decline to exercise supplemental jurisdiction over a claim" if:

**(1)** the claim raises a novel or complex issue of State law,

_____

[12]The PERA is clearly a state agency and a state actor.  The Defendants wisely conceded this point during the hearing.  <u>See</u> Tr. at 38:8-18 (Rennick).  The Court will thus disregard the Defendants' arguments that the PERA is not a state actor.  <u>See</u> Response at 8-11.

(**2**) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(**3**) the district court has dismissed all claims over which it has original jurisdiction, or

(**4**) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  See City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)("Depending on a host of factors, then -- including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims -- district courts may decline to exercise jurisdiction over supplemental state law claims.").  The Plaintiffs' claims raise novel issues of state law related to the interpretation of the New Mexico Constitution and New Mexico statutes. For example, the Defendants cite only one 1925 case for their distinction between "public officers" and the PERA's Board members.  Response at 6.  A state court would be far more qualified to decide specific issues relating to the PERA's elections.  Moreover, the Plaintiffs' "federal interest is sort of a gloss on what the real issue is here" -- whether the PERA Board complied with state law.  Tr. at 42:19-23 (Rennick).

32.     The Court cannot overemphasize the importance of elections in a democratic and republican form of government.  They are in need of protection by all three branches of government, especially from the un-elected branch, the judiciary.  But precisely because elections need protection from the judiciary, we must be careful that it does not, in the name of protection, overprotect, or meddle in something that should be left as much as possible to the elected branches.  In large part, the courts should not care how the executive and legislative branches choose their leaders, either through elections, appointment, or some other mode.

33.     When a federal court is asked to review a state election, the need for care and caution is even more prominent, because federalism is at play.  To a great extent, the federal Constitution and laws are agnostic on how states pick their officials.  Especially when the issue is how members of boards, commissions, and agencies are chosen, who are in many states often appointed, the federal interest in how these officers are filled is low.  The federal courts should be careful that all the state law issues that arise from state elections are not moved across the street from state court to federal court in the guise of protecting the First Amendment association and due process rights.  Otherwise, the federal court will become the preferred venue of some party or individual for resolving all state election disputes.

34.     The Court does not suggest that federal courts have no role in protecting the electoral system, be it federal or state elections.  The federal Constitution sets forth the mechanics about elections for the President and Congress.  See, e.g., U.S. Const. art. I, § 3, cl. 1 ("The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof, for six Years.").

35.     Moreover, federal and state courts do halt violations of equal protection, such as discrimination on race, religion, or nationality.  Unless the case involves these expansive categories of discrimination of suspect or protected categories, the federal courts should be reluctant to micro-manage state elections.

36.     Once the federal court decides there is no federal interest in need of protection, there is even less of a sound basis for the court to hang on to the case and decide state law issues. The federal court does not have an interest in whether the PERA -- the state -- employs a mailbox rule, accepts emailed nominations, or cancels unopposed elections without allowing for a write-in ballot.  At this point, the Court will let the parties see what it has decided on the

chances of there being a federal claim, and signal that it is unlikely to keep the case. It certainly should not proceed to decide the issues in favor of the Plaintiffs and against the state on state law grounds. These issues should be left to the state courts.[13]

_____

[13]Although the Court does not reach the state law issues in this matter, it notes that a state court might disagree with the Plaintiffs' arguments. First, the Plaintiffs' interpretation of NMSA 1978 § 10-11-130 seems, at this early stage, somewhat implausible. The provision reads, in part:

> The retirement board consists of:
>
> (1) the secretary of state;
>
> (2) the state treasurer;
>
> (3) four members under a state coverage plan to be elected by the members under state coverage plans;
>
> (4) four members under a municipal coverage plan to be elected by the members under municipal coverage plans, provided one member shall be a municipal member employed by a county; and
>
> (5) two retired members to be elected by the retired members of the association.

NMSA 1978 § 10-11-130(B)(1)-(5). It also states: "The results of elections of elected members of the retirement board shall be certified at the annual meeting of the association. Elections shall be conducted according to rules the retirement board adopts from time to time." NMSA 1978 § 10-11-130(C). The Plaintiffs argue that the phrase "to be elected by the members" and the reference to the "elected members of the retirement board" require the PERA to hold an election regardless of the number of candidates unless an elected Board member has failed to attend four consecutive Board meetings. Reply at 5. They thus contend that the statute is inconsistent with the PERA's rule, N.M.A.C. § 2.80.200.70(6), which allows PERA's Board to cancel an election and declare a winner.

A state court might find that the statute does not require this result. Courts must interpret the statute, if possible, to: "(1) give effect to its objective and purpose; (2) give effect to its entire text; and (3) avoid an unconstitutional, absurd or unachievable result." NMSA 1978, § 12-2A-18. A state court might find that interpreting this statute to require an election with only one name on the ballot would produce an absurd result. See Padilla v. Montano, 1993-NMCA-127, ¶ 23, 862 P.2d 1257, 1262 ("We will not construe a statute to defeat the intended purpose or achieve an absurd result."). Such a result could be contrary to the PERA Board's primary function -- its fiduciary responsibility to its members and beneficiaries. See N.M. Const. Art. XX, § 22(B). Moreover, the statute's identification of the PERA Board's "elected" members may have been intended to distinguish them from the PERA Board's permanent, ex officio members -- the Secretary of State and the Treasurer. NMSA 1978 § 10-11-130(B)(1)-(2); Board

37.     The Court concludes that the Plaintiffs have not established a substantial likelihood of success on their case's ultimate merits.  The Court therefore denies the Motion.

**IT IS ORDERED** that the requests in the Plaintiffs' Motion for Preliminary Injunction and Memorandum in Support, filed November 4, 2015 (Doc. 22), are denied.

_____
UNITED STATES DISTRICT JUDGE

---

of Trustees, PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, http://www.nmpera.org/board-of-trustees (last visited Jan. 9, 2016).  Contrary to the Plaintiffs' assertions, there is no constitutional right to a write-in space on a ballot.  See Burdick v. Takushi, 504 U.S. 428, 441-42 (1992)(holding that a state may completely ban write-in voting).

Second, future courts interpreting these provisions must give considerable deference to the PERA's interpretation of the statutes and regulations that it administers.  The Plaintiffs make a number of arguments that essentially interpret the PERA's rules.  They contend that the agency must accept non-original nominations based on the plain meaning of N.M.A.C. § 2.80.200.70(A)(3).  See Motion at 18 ("Under PERA's election rules, any nomination that includes the four elements outlined in § 2.80.200.70(A)(3) N.M.A.C. must be counted toward the 150 valid nominations to be placed on the ballot.").  They argue that Resolution 15-04 failed to comply with N.M.A.C. § 2.80.200.70(A), because it used the term "filed" instead of copying the rule's use of "returned."  Motion at 19 ("Plaintiff Logan clearly returned his petitions before April 14, 2015.")(emphasis added).

"When an agency that is governed by a particular statute construes or applies that statute, the court will begin by according some deference to the agency's interpretation."  Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n, 1995-NMSC-062, ¶ 11, 904 P.2d at 32.  This rule also applies to state agencies' interpretations of their own regulations.  See New Mexico State Bd. of Psychologist Examiners v. Land, 2003-NMCA-034, ¶ 5, 62 P.3d 1244, 1247.  The New Mexico statute governing the PERA provides that "elections shall be conducted according to rules the retirement board adopts from time to time."  NMSA 1978 § 10-11-130(C).  The PERA is charged with administering a complex statutory and regulatory scheme.  It has interpreted N.M.A.C. §§ 2.80.200.70(A)(3) and § 2.80.200.70(A), and courts must, under state law, give significant weight to its interpretation.

*Counsel*:

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

     *Attorney for the Plaintiffs*

David Anthony Roman
Charles H. Rennick
Robles Rael & Anaya, PC
Albuquerque, New Mexico

     *Attorneys for the Defendants*